**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NHS HUMAN SERVICES,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| **v.** | : | |
| | : | |
| **LOWER GWYNEDD TOWNSHIP, et al.,** | : | |
| *Defendants.* | : | **No.  11-2074** |

**MEMORANDUM**

PRATTER, J.                                                                                                JANUARY 20, 2012

NHS Human Services ("NHS") brought this action against Lower Gwynedd Township, Lower Gwynedd Township Zoning Hearing Board, Francis Vitetta, Cary Levinson, and Dennis Daly [1] (collectively "Township Board"), alleging that they violated the Fair Housing Amendments Act, the Rehabilitation Act, and the ADA and denied NHS and its constituents equal protection under both the Pennsylvania and U.S. Constitutions when they refused to grant NHS a special exception to open a "family residence" for severely mentally retarded individuals in a house NHS purchased in Lower Gwynedd Township.  The Township Board has moved to dismiss all of NHS's claims.  For the reasons discussed below, the Court will grant the Township Board's motion in part and deny it in part.

**Factual and Procedural History**

Unless otherwise stated, these facts are drawn from Plaintiff's Complaint and accepted as true for the purposes of this motion.  NHS alleges that it and its subsidiary organization, Allegheny Valley School, provide community based services to individuals with intellectual developmental disabilities.  As part of their mission to improve the quality of life for people

---

[1]      The latter three Defendants are all members of the Lower Gwynedd Township Zoning Hearing Board.

suffering from such disabilities, NHS and Allegheny try to integrate them into community settings by placing them in conventional residential homes, rather than in institutions. NHS chooses individuals with similar needs and diagnoses and places them in a home where they "function much like a family"–they live together, eat together, perform chores together, and the like, under the supervision of NHS employees.

In April, 2010, NHS and Allegheny bought a home at 761 Tennis Avenue, Lower Gwynedd, PA ("the Property"). The single-family dwelling, located in the Township's A-Residential Zoning District, was purchased with the intent to house four adults with intellectual developmental disabilities, as well as a full-time, live-in caregiver. According to the Complaint, the four individuals have a "high level of functioning" but are unable to live on their own without support and assistance in performing basic tasks like cooking, hygiene, cleaning, dressing, transportation, and other daily tasks. NHS alleges that this use of the property would not detrimentally affect the health, safety, and welfare of the surrounding neighbors or the Township.

On March 29, 2010, NHS submitted an application for a special exception to allow four unrelated adults and one full-time staff member to reside at the Property and also asked that the Township interpret Lower Gwynedd Ordinance § 1257.02(a)(2) to encompass NHS's proposed use. The relevant ordinance allows only single-family detached dwellings and certain other specific uses that are patently inapplicable to NHS and defines "family" as follows:

> "Family" means any number of individuals living together as a single, nonprofit housekeeping unit and doing their cooking together and on the premises, provided that not more than one of such number are unrelated to all others by blood, marriage or legal adoption. As a special exception, the Zoning Hearing Board may interpret the term "family" to include:
> A.    A group of individuals, not exceeding five (if more than one of the individuals is unrelated to all others by blood, marriage or adoption) domiciled together in a

> single-family dwelling unit and whose relationship is of a continuing,
> nontransient, domestic character and who are cooking and living together as a
> single, housekeeping unit.  This definition shall specifically not include occupants
> of a club, fraternity house, lodge, rooming house, hotel, motor court, bed-and-
> breakfast, hospital, assisted-living facility, life-care facility or the like.

Lower Gwynedd Code §1250.04(a)(27).  At a hearing lasting for three Township Board sessions,

NHS presented testimony that the five proposed residents would function as a single nonprofit

housekeeping unit and that, barring unforeseen medical issues, the four disabled individuals

would live together for the rest of their lives.  NHS alleges that a number of residents and

neighbors spoke at the meeting and opposed the application because of "concerns related to the

suspected [disability] limitation and needs of the individuals."

On November 11, 2010, the Township Board denied NHS's request.  In the denial,

attached as Exhibit E to the Board's motion,[2] the Township Board interpreted the proposed use

as specifically barred by the special exception portion of the ordinance because the home would

be licensed as an "Intermediate Care Facility for Mentally Retarded Persons," which, according

to the Township Board, by definition is either an "assisted-living" facility or "the like."  The

Township focused heavily on the word "facility" and its connotations.  Also, while accepting that

NHS and Allegheny are non-profits, the Township Board cited the "profit-motive" of the NHS

and Allegheny staff as supporting the interpretation of the proposed use as a business rather than

a home.

The Township Board also dedicated much of its attention in its opinion specifically

analyzing the parking and traffic burdens that would come with operating the home.  Not

---

[2]        Though not attached to the Complaint, the Township Board opinion is a document
on which the Complaint relies, as well as a public record, which the Court may consider
regardless of whether the motion is considered to be one for dismissal or for summary judgment.

mentioned in the Complaint, but included in the Township Board opinion, is the fact that Tennis Avenue is a busy road with no street parking, the Property and three other homes are located on a one-lane private road off of Tennis Avenue, and not only would a live-in staff person reside at the Property, but an additional staff member or two would be at the home 24 hours a day in eight-hour shifts to assist in the residents' care.  According to the Township opinion, at the end of each shift, the departing staff members would overlap with the arriving staff members for half an hour. In addition, according to the opinion, there was conflicting testimony at the hearing presented about daily visits of a nurse and regular visits of other administrative staff and family members of the residents.  The Township Board found that all of this activity at the home would create a burden on the neighborhood by increasing the traffic and parking difficulties.  The Township Board also specifically noted that NHS did not apply for a variance or claim that the Ordinance was unconstitutional.

In its Complaint, NHS claims that this denial violated the FHAA, ADA, and Rehabilitation Act, alleging that the denial constituted discrimination in that it reflected a failure to make a reasonable accommodation under the relevant statutes and a denial of the right of disabled individuals to live in the community.  Although NHS does not specifically say so in its Complaint, in its Opposition, NHS claims that it is making these statutory claims under three theories: reasonable accommodation, disparate treatment and disparate impact.  NHS also brings two equal protection claims, alleging that the Board unlawfully discriminated against NHS because of the disabilities of its constituents, thereby violating both the United States and Pennsylvania Constitutions.

The Township Board filed a motion to dismiss or for summary judgment, which the

Court, as discussed at oral argument, will treat solely as a motion to dismiss.[3]  NHS challenges

the motion, arguing that not only is its Complaint sufficient to withstand a motion to dismiss, but

that to the extent that the Township Board seeks summary judgment, its motion is premature.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. *Conley v. Gibson*,

355 U.S. 41, 45–46 (1957).  Although Rule 8 of the Federal Rules of Civil Procedure requires

only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.

R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the ... claim is and the

grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

quotation marks omitted) (alteration in original) (quoting *Conley*, 355 U.S. at 47), the plaintiff

must provide "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Id.* (citation omitted).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *see also Matrixx Initiatives, Inc. v. Siracusano*,

131 S. Ct. 1309, 1323 (2011).  Specifically, "[f]actual allegations must be enough to raise a right

to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted).   The

question is not whether the claimant will ultimately prevail but whether the complaint is

"sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296

(2011) (citation omitted).  An assessment of the sufficiency of a complaint is thus "a

---

[3]        At oral argument, counsel for the Board voluntarily withdrew the motion to the
extent that it sought summary judgment.

context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (citations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must only consider those facts alleged in the complaint and accept all of those allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *see also Twombly*, 550 U.S. at 555 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). Concomitantly, the Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). Nonetheless, the Court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citing *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d. 902, 906 (3d Cir. 1997).

The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007); *Pension Benefit Guar. Corp.*

6

*v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Specifically, a court may take

judicial notice of the record from a state court proceeding and consider it on a motion to dismiss.

*See, e.g.*, *Poli v. SEPTA*, No. 97-6766, 1998 WL 405052, at *3, n.1 (E.D. Pa. Jul. 7, 1998).

DISCUSSION

    **A.    Abstention and Deference**

    According to the Board's motion, NHS has also appealed the Board's decision, and that

appeal is now pending in state court. Based on this information the Court asked the parties to

provide supplemental briefing regarding (1) the role, if any, of the pendency of a state court

appeal of the Defendants' zoning decision, specifically discussing the actual issues raised in the

appeal and on the impact of the appeal on this Court's jurisdiction; and (2) whether or not a

federal court must give deference to the decision of a zoning hearing board in any respect. Both

parties have now filed this supplemental briefing.

    *1.    State Court Appeal*

    In its state court appeal, NHS argues that the Township Board should have granted a

special exception to allow its proposed use and cites the FHAA as supporting its entitlement to a

special exception. NHS did not cite the Rehabilitation Act, the ADA, or the U.S. or

Pennsylvania Constitutions. According to the parties, in the appeal, NHS is not allowed to

present any new evidence, raise any new claims, pursue any discovery, or seek a trial by jury. It

is also not entitled to any compensatory damages or attorneys' fees in the state appeal.

    The Township Board's supplemental brief focuses almost entirely on issues of ripeness

and cites to cases that hold that once a final decision is made by the zoning authority, a civil

rights suit based on that decision is ripe and that finality does not depend upon the outcome of a

state court review of the decision.  *See Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d

1285, 1293 n.12 (3d Cir. 1993).  The Township Board does not discuss any other doctrine that

might either prevent or dissuade this Court from exercising its jurisdiction over the case, and at

no time did the Board argue that the Court should abstain from hearing this case.[4]

  In its supplemental brief, NHS focuses on various abstention doctrines.  It argues that the

state court appeal is not "parallel" to the federal suit because NHS cannot file a complaint, take

discovery, or present evidence at trial, which means that NHS will not have the opportunity to

probe the Board's arguably discriminatory motives.  Moreover, according to NHS, the remedies

in each of the suits differ; no compensatory damages or attorneys' fees are available in the state

court proceeding.  NHS also argues that the state appeal is considered a "remedial" proceeding,

i.e., one intended to vindicate a wrong inflicted by the state, rather than a "coercive" proceeding,

i.e., one in which the federal plaintiff is a state court defendant and the state court action was

initiated to enforce a law, and that as such, abstention is inappropriate.  *See, e.g., Assisted Living*

*Assoc. of Moorestown v. Moorestown Twp.*, 996 F. Supp. 409 (D.N.J. 1998) (discussing *Younger*

abstention in the context of an FHAA action); *see also Minsec Cos. v. City of Philadelphia*, Civil

---

[4]  The Township Board does, however, note that the Township offered, by way of
settlement, to let NHS operate its group home with "modest modifications" to the property (i.e.,
constructing a new driveway directly off of Tennis Avenue rather than the common private
driveway and adding plantings to provide "a visual barrier" between the group home and the
other properties on the private drive), and that NHS responded by telling the Township that it no
longer intends to operate a group home at that location but rather plans to sell the property.  The
Board contends that once NHS sells the property, it will lose standing in its state court appeal and
will no longer be able to seek injunctive relief in the federal civil rights suit.  It posits that NHS's
standing to assert the other claims "may depend on the terms of the sale or other disposition of
the real property on Tennis Avenue."  NHS does not address or discuss any of these issues in its
supplemental brief, and at this stage of the case, the Court will not consider the Board's
speculations as to future events, but rather will only look to NHS's pleadings and the public
records properly before the Court.

Action No. 09-3396, 2010 WL 996504 (E.D. Pa. Mar. 18, 2010) (refusing to abstain under either *Colorado River* or *Burford* abstention doctrines from housing discrimination case when state zoning appeal was pending, even when that appeal potentially implicated FHA issues); *Remed Recovery Centers v. Twp. of Worcester*, No. Civ. A. 98-1799, 1998 WL 437272 (E.D. Pa. Jul. 30, 1998) (same, plus a refusal to abstain under the *Younger* abstention doctrine). *But see Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399 (3d Cir. 2005) (upholding *Younger* abstention in part in a case involving a "remedial" appeal of a land use decision, without discussing or adopting the coercive/remedial dichotomy); *Nat'l Parks Conservation Ass'n v. Lower Providence Township*, 608 F. Supp. 2d 637, 652-55 (E.D. Pa. 2009) (invoking *Younger* abstention and discussing the lack of Supreme Court or Third Circuit Court of Appeals precedent employing the coercive/remedial distinction in a case in which the state interest is clear and the underlying state case is not a § 1983 action, such as a land use case).

   Rather than wade into murky abstention waters, the Court notes that at no point have the Defendants in this case invoked abstention, even when presented with multiple opportunities to do so. At oral argument and in their supplemental brief, the Board has stated that the claims in this case are properly before this Court. As the Third Circuit Court of Appeals noted in *Addiction Specialists*, "[t]he Supreme Court has held that a state or municipal defendant may 'voluntarily submit to federal jurisdiction even though it might . . . have a tenable claim for abstention.'" 411 F. 3d at 409 (quoting *Ohio Civil Rights Comm'n v. Dayton Christian Sch.*, 477 U.S. 619, 626 (1986) and citing *Brown v. Hotel Employees*, 468 U.S. 491, 500 n.9 (1984); *Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the state voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court

force the case back into the State's own system."))  Because the Township Board has voluntarily submitted to this Court's jurisdiction, the Court will not undertake an abstention analysis, but rather will proceed to rule on the motion to dismiss before it.

## 2.    *Deference*

The Board urges that the Third Circuit Court of Appeals emphasizes that land use decisions are uniquely local in nature.  NHS counters that no matter what the local interest, federal courts must insure that the interest is effectuated in a non-discriminatory manner.  Both parties recognize that a federal action under the FHAA and related statutes is more than just a review of the zoning decision, but is rather a *de novo* proceeding.  Thus, both parties agree that the Board decision is in no way binding on this Court.

## B.    **The Township Board's Motion**

As an initial matter, the Board argues that it did not abuse its discretion or commit a manifest error in law, the standard applied by a common pleas court in Pennsylvania when reviewing a zoning decision, and that NHS did not specifically state at the outset of the zoning board proceedings that the ordinances were unconstitutional or violated the FHAA, ADA, or Rehabilitation Act, but rather sought a special exception (tacitly admitting, according to the Board, that the proposed use was not one as of right).  Therefore, the Board asserts, the Complaint should be dismissed.

The Board cites only one case to support this argument.  In that case, a plaintiff, as a class of one, claimed that the zoning board discriminated against him when denying his building permit application.  *See Wagner v. Harmer*, 651 F. Supp. 1286 (W.D. Pa. 1987).  After successfully appealing that decision in state court, the plaintiff sued in federal court under §

1983.  All that the plaintiff alleged in that case, however, was that in other situations in prior years, the township did not strictly enforce the zoning ordinance or appeal grants of variances. The court held that these facts did not sufficiently state a cause of action under an equal protection theory.  The Zoning Board seems to interpret this case as stating that plaintiffs cannot sue zoning boards merely for applying local ordinances and defending their decisions.  While that may be true as a general proposition, NHS has certainly alleged more in this case than just dissatisfaction with a zoning decision, and thus, the Court will not grant the Board's motion on this ground.

### 1.    *FHAA, Rehabilitation Act, and ADA Claims*[5]

The FHAA prohibits discrimination in the sale or rental of property to handicapped individuals.  FHAA claims may fall under any of three theories: (a) disparate treatment, (b) disparate impact, and/or (c) failure to reasonably accommodate.  *See Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 448 n.3 (3d Cir. 2002).  NHS advances all three theories in this suit.

### a.    *Reasonable Accommodation*

In *Lapid-Laurel*, the Third Circuit Court of Appeals articulated the burden-shifting analysis to be used in "reasonable accommodations" cases.  First, a plaintiff must show that a requested reasonable accommodation "was necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling."  *Id.* at 457.  Defendants must then show that the requested accommodation was unreasonable–that it (1) imposed an undue financial and

---

[5]       Both parties agree that the standards applied to FHAA, Rehabilitation Act, and ADA claims are the same in this context, so both parties focus solely on the FHAA in discussing the relevant law and note that analysis under the other two statutes would be identical.  The Court will do the same.

administrative burden on the municipality, (2) imposed undue hardship on the municipality, or (3) required a fundamental alteration in the nature of the municipality's zoning scheme. *Id.* at 462. The court also noted that defendants' arguments about the reasonableness of a proposed accommodation are "highly fact-specific, requiring a case-by-case determination." *See id.* (internal quotation omitted).

The Township Board starts its challenge to NHS's FHAA "reasonable accommodation" claim by citing several cases that stand for the general proposition that land use decisions are local in nature and that courts should be cautious about disturbing them. *See, e.g., Lapid-Laurel*, 284 F.3d at 451; *Acierno v. Mitchell*, 6 F.3d 970 (3d Cir. 1993). The Board also notes that NHS "tacitly acknowledged" that its proposed use was not a by-right use.

Rather than directly attack NHS's pleading on the issue of reasonable accommodations, the Board likens this case to the one before the Third Circuit Court of Appeals in *Lapid-Laurel* and states that the Board should similarly be excused from reasonably accommodating NHS on the strength of that case. In *Lapid-Laurel*, a real estate developer submitted a plan to a township zoning board for a 95-bed facility for the elderly. *Lapid-Laurel*, 284 F.3d at 446-47. The relevant zoning ordinance in that case did not permit the proposed use as of right, so the developer asked for a variance as to that issue, as well as to several other features of its plan which did not comply with township zoning provisions. The board denied the developer's request, citing several concerns, such as negative impact on the municipal zoning plan (indisputably commercial use in a residential area), traffic safety concerns presented by the specific parking lot planned, the impact on protected wetlands that were located on the site, and insufficient emergency vehicle access. *Id.* at 447-48.

The court first found that the plaintiff had failed to carry its burden in proving that the accommodation sought was "necessary." Because the primary reason that variances were needed for the facility in the first place was its size, the plaintiff had to demonstrate the necessity of a facility of that size and failed to do so. The plaintiff presented no evidence that a smaller facility would not be financially viable or that there was some other therapeutic need for a larger facility. *Id.* at 461. At most, the plaintiff presented some evidence that care facilities of the size proposed worked well, but that evidence did not show that a facility of the size proposed was therapeutically superior to a smaller facility.

The court then, as an alternative ground for upholding the grant of summary judgment in favor of defendants, discussed whether the requested accommodations were unreasonable. *Id.* at 462. Because of the specific facts presented as to the impact on traffic safety and emergency vehicle access, the court concluded that the requested accommodations would have caused an "undue hardship," and that therefore the accommodations were unreasonable. *Id.* at 466.

Here, the Board argues that because it found that the proposed use was a commercial one, or a use akin to an assisted living facility or nursing home (i.e., uses specifically excluded from "A-Residential" districts), and because it, like the defendants in *Lapid-Laurel*, found that increased traffic and parking issues would impact health and safety, NHS's reasonable accommodation claim must fail.

First off, the situation at hand here–a proposed five-person living arrangement with a few additional staff members coming and going at various times during the day–is hardly on all fours with the situation in *Lapid-Laurel*, which involved a 95-bed facility with much larger staffing requirements and greater likelihood of serious traffic difficulties. And the *Lapid-Laurel* Court's

13

decision that, in the alternative, the requested accommodation was unreasonable (on which

judicial language the Board relies) easily could be considered *dicta*.

Even if it were more factually similar, a decision on whether the Township Board

properly concluded that NHS's proposed accommodation was unreasonable would require a full

examination of the evidence before the Board.  In arguing that NHS's accommodation was

unreasonable, the Township Board points the Court to its zoning decision, which explains its

findings based on the hearing record.  However, although the Board does provide hearing

transcripts as attachments to its motion, it does not provide any exhibits to the transcripts or

represent that it has presented all of the evidence before the Board.  Moreover, the Township

Board decision itself relies heavily on credibility assessments of various testifying witnesses,

rather than on actual demonstrable facts.  The pending motion also does very little to assist the

Court in making the type of fact-intensive examination required–the Township Board provides

no citations to the record and did not submit a statement of undisputed facts, and, in any case, the

Board specifically withdrew the summary judgment portion of its motion at oral argument.

NHS alleges in its Complaint that it requested a reasonable accommodation when it

requested that its proposed use be given "family" status, and that this accommodation was

necessary because without it, disabled individuals were barred from living in the community.  In

accordance with the Third Circuit Court of Appeals's admonition that a decision regarding the

reasonableness of an accommodation is highly fact-specific, it would be premature to grant

summary judgment or to dismiss NHS's reasonable accommodation claim, and the Court

declines to do so.

14

b.      *Disparate Treatment and Disparate Impact*

To state a claim for disparate treatment, a plaintiff must allege that a

discriminatory purpose was a motivating factor behind the challenged action, or that a challenged

regulation is facially discriminatory.  *See Community Services, Inc. v. Wind Gap*, 421 F.3d 170,

177 (3d Cir. 2005).  "The discriminatory purpose need not be malicious or invidious, nor need it

figure in solely, primarily, or even predominantly into he motivation behind the challenged

action."  *Id.* (internal quotation omitted).  Regulations may still not pass muster if they use

neutral-sounding language as a proxy for a protected trait.  *Id.*  FHA claims under both disparate

treatment and disparate impact theories use the same burden-shifting rubric as employment

discrimination claims.  Therefore, once a plaintiff shows that a statute is facially discriminatory

or that a defendant's actions were motivated by a discriminatory purpose, it is up to the defendant

to show that it had a legitimate, non-discriminatory reason for its actions and that no less

restrictive course of action could be adopted.  *See Dr. Gertrude A. Barber Center, Inc. v. Peters

Township*, 273 F. Supp. 2d 643, 656 (W.D. Pa. 2003).

NHS argues that it has alleged that the Township Board has subjected NHS to disability-

based discrimination and that the Board's actions were motivated by a discriminatory purpose.

NHS does not point the Court to any specific facts pleaded in support of these conclusory

statements; however, NHS did plead that its constituents were handicapped, that the Board knew

that, and that the Board denied NHS's zoning application after a hearing at which township

residents voiced concerns relating specifically to the proposed residents' handicaps.  Moreover,

NHS points to numerous cases in which courts have held that living arrangements similar to

NHS's proposed arrangement constituted family use.  *See also Devereaux Found. v. O'Donnell*,

Civ. A. No. 89-6134, 1990 WL 2796 (E.D. Pa. Jan. 12, 1990) (collecting Pennsylvania cases for "the position that residential CLAs for mentally retarded citizens are 'families' for zoning purposes").  The ordinances in those cases are often distinguishable, but the essential point remains that the Township Board's interpretation of its ordinance seems, at least at first glance, to be suspect and against the weight of legal authority.  And, as NHS points out, the lack of definition in the Township's ordinances for the term "assisted-living facility" gives the Board potentially disturbing leeway to classify nearly any living arrangement for handicapped individuals as such and to therefore exclude them from residential zones.

Moreover, the Board's classification of the proposed living arrangement as "commercial" would likewise exclude the severely handicapped from A-Residential zones.  Both of these possibly faux classifications (as "commercial" and as an "assisted living facility") make this case appear to be a classic "proxy" discrimination situation.  Because the Board has not explicitly addressed this theory but has focused on arguing that NHS's proposed living arrangement was a business just like any other commercial enterprise excluded from residential zones, it remains to be seen whether it can carry its burden to show that it had no less restrictive alternative than to deny the application.

As to disparate impact, plaintiffs advancing such a theory must show that the defendants' policies have a greater impact on disabled individuals than on non-disabled individuals.  If a plaintiff establishes a prima facie case, as in the disparate treatment rubric, a defendant then must show that it had legitimate non-discriminatory reasons for its actions and that no less discriminatory alternatives were available.  *See Barber Center*, 273 F. Supp. 2d at 656.  NHS claims to have met its pleading burden by alleging that non-disabled individuals have their

choice of living arrangements in the Township, while disabled individuals–at least those who require the level of care provided by NHS and Allegheny–do not.  Indeed, there is case law supporting the general idea that zoning ordinances that restrict unrelated adults from living together have a greater impact on disabled individuals than on non-disabled individuals.  *See, e.g., Barber Center*, 273 F. Supp. 2d at 655 (finding a disparate impact when an ordinance prohibited more than three unrelated individuals from living together and the only financially feasible option for the disabled plaintiffs was an "intermediate care facility for mental retardation" with four residents, plus staff); *Oxford House*, 799 F. Supp. at 461 ("Because people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement . . .in which groups of unrelated individuals reside together in residential neighborhoods for mutual support . . .[the Township's] application of this ordinance has a disparate impact on such handicapped people."). Thus, the Complaint, although sparse, does just enough to make out a claim for disparate impact.

### 2.    *Equal Protection Claims*[6]

To state an equal protection claim, disabled plaintiffs must allege that they were treated differently from non-disabled individuals and that there was no rational basis for the difference in treatment.  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985).  The

---

[6]    In the Board's equal protection argument, it casually throws out the fact that a substantive due process challenge to zoning legislation is also subject to rational basis review. The Board does not pick up this argument again, but NHS, in its opposition, devotes a section of its brief to arguing that it has stated a claim for a substantive due process violation, despite not explicitly articulating such a claim in its Complaint.  Because NHS did not explicitly include a substantive due process count in its Complaint, the Court will not entertain any arguments from NHS that it has; the failure to explicitly set forth any such claim in the Complaint falls short of Rule 8's notice pleading requirements.

Township Board begins by setting out the facts of *Cleburne* and arguing that because this case is distinguishable (i.e., because the ordinance does not specifically say that only mentally retarded individuals are excluded or that zoning uses with identical effects are permitted when uses for mentally disabled individuals are not), NHS's claims fail.  The Board points out that "[t]he Township permits nursing homes and similar facilities in various districts (MF-3 Multi-Family Residential, MF-3A, MF-3B and D-Business Districts).  There is no specific exclusion in the zoning ordinance for group homes, assisted living facilities or life-care facilities for mentally-handicapped or retarded individuals."  Board Mem. of Law at 17.  It is true that all people in need of assisted living seem to be treated the same in Lower Gwynedd; however, that does not necessarily defeat NHS's contention that the disabled as a larger group are treated differently than the non-disabled,[7] and the Board cites no case law that says that the only equal protection challenge that can succeed is one charging that a specific group of disabled individuals is treated differently from other disabled individuals.

Next, the Township Board argues that NHS has not alleged, and cannot allege, that it is similarly situated in all relevant aspects to others receiving better treatment.  To advance this argument, the Board notes that it is difficult to prove that one parcel of land is similarly situated

---

[7]        Moreover, the zoning districts that the Board points to, rather than prove that NHS has other residential districts to choose from in Lower Gwynedd, demonstrate the opposite.  The first three multi-family districts that the Board points out do specifically all allow assisted living facilities, but they also require lots of no less than 20 acres.  For a proposed use by only four disabled individuals and one live-in house parent, 20 acres would almost certainly be cost-prohibitive and would not serve the essential purpose of NHS's proposed use, which is to integrate its constituents into the community.  The final option is obviously, as it is named, a business district, which, again, fails to allow for the integration of the disabled individuals in question into a normal residential community.  Essentially, then, the Township Board seems to have essentially admitted that at least these Plaintiffs cannot live in a residential neighborhood in Lower Gwynedd in their proposed group home arrangement.

to another.  It also focuses on *The Development Group v. Franklin Township Board of Supervisors*, No. Civ. A. 03-2936, 2003 WL 22358440 (E.D. Pa. Sept. 24, 2003) (Baylson, J.) and other "class of one" equal protection cases.  In *Development Group*, land developers claimed to have been subject to a much more onerous approval process before the zoning board than other developers and to have had their plans rejected for minor ordinance violations which were waived for other developers.   The court dismissed the plaintiffs' complaint; although the complaint identified a few other developments which plaintiffs claimed were similarly situated, plaintiffs did not provide any factual details supporting the allegations that these other developments were actually similar, nor did plaintiffs plead any facts in support of the absence of a rational basis for the defendants' actions.  *Id.* at *7.  The Board argues that NHS similarly fails to flesh out the "legal conclusions" contained in Counts IV and V of its Complaint, as to either prong of the rational basis test.

NHS counters that because it has alleged that its application was denied because of its association with disabled individuals, its claim should survive.  NHS's allegations are indeed sparse, however, and NHS does not explicitly identify which facts it contends support its equal protection claims, nor does it explicitly identify similarly situated individuals subject to preferential treatment.  Reading the Complaint indulgently, it can be inferred that non-disabled individuals who are related to one another can reside in a residential district as of right without even having to apply to the zoning board for approval (although disabled individuals who were related to one another could also do so) and that non-disabled individuals who are not related to one another but who intend to live as a family may be more likely to get a special exception. NHS does not use the words "similarly situated" anywhere in its Complaint; in its equal

19

protection counts, it merely states that it was subject to arbitrary, capricious, and irrational discrimination based on disability.

NHS cites *Lamb Foundation v. North Wales Borough*, No. 01-950, 2001 WL 1468401 (E.D. Pa. Nov. 16, 2001) in support of its equal protection counts.  In that case, operators of homes for the mentally and physically disabled sued a municipality after it changed zoning ordinances to require a special exception for residential dwellings housing unrelated people and allegedly threatened to enforce the ordinance against the plaintiffs but not against other similarly situated individuals or organizations.  The plaintiffs also alleged that the defendants sent them enforcement notices that claimed that their group homes were "institutional" rather than residential uses and therefore not permitted in residential districts; the enforcement actions were later withdrawn after "an exhaustive investigation." *Id.* at *2.  In a very brief discussion, the court held that "Plaintiffs' allegations that they were subjected to threats of zoning enforcement actions, harassment, and other abuses, because of their association with the mentally and physically disabled in the Borough, suffice to allege an equal protection violation." *Id.* at *14. *See also In re Millcreek Township Zoning Ordinance*, 4 Pa. D. & C. 4th 449 (1989) (holding that ordinance excluding group homes from residential districts violated equal protection because the township was not allowed to make a distinction between disabled and non-disabled individuals solely based on the level of personal care and assistance needed by disabled individuals).

Unfortunately for NHS, *Lamb Foundation* is ambiguous as to what factual details, if any, the plaintiffs pleaded to support their allegations that similarly situated individuals were treated preferentially, and the discussion of the actual substantive law is cursory.  Given that NHS did not explicitly plead *anything* about similarly situated individuals, NHS's equal protection claims

20

are on the flimsiest legal footing of all of the claims it asserts and will be dismissed.  *See also Bowes v. South Whitehall Township*, Civil Action No. 09-5784, 2010 WL 3212483, *6 (E.D. Pa. Aug. 12, 2010) (dismissing equal protection count of handicapped plaintiff who was denied a zoning variance because the complaint contained "no factual allegations regarding other similarly situated residents who had been treated differently"); *Sunrise Development v. Lower Makefield Township*, No. 2:05-CV-02724, 2006 WL 626806, *7 (E.D. Pa. Jan. 23, 2006) (dismissing equal protection claim when plaintiffs did not identify any similarly situated individuals in their complaint, noting that "this Court cannot assume that plaintiffs can prove facts that they have not alleged").  However, NHS may seek leave to amend its equal protection claims.

CONCLUSION

For the foregoing reasons, Defendants' Motion is granted as to Counts IV and V and denied as to Counts I, II, and III of Plaintiff's Complaint.  An appropriate Order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE